## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CFP NEW ORLEANS, LLC** | ) | **CIVIL ACTION NO.:** |
| **Plaintiff** | ) | |
| **Versus** | ) | **DIVISION (SECTION):** |
| | ) | |
| | ) | **JUDGE:** |
| **ORLEANS PARISH JUDICIAL DISTRICT** | ) | |
| **COURT BUILDING COMMISSION,** | ) | **MAGISTRATE:** |
| **JUDGE KERN REESE and JUDGE** | ) | |
| **CHRISTOPHER BRUNO** | ) | |
| **Defendants** | ) | |
| _____ | ) | |

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, CFP New Orleans, LLC, which respectfully files this lawsuit as follows:

## PARTIES

1.    CFP New Orleans, LLC, the Plaintiff herein, is a Minnesota nonprofit limited liability company, whose sole member is Community Facility Partners, a Minnesota nonprofit corporation (hereinafter referred to as "**CFP**" or "**Company**").  Both the Company and Community Facility Partners have their principal office at 18336 Minnetonka Boulevard, Suite C, Deephaven, Minnesota 55391.

2.    Made Defendants are:

a.    The Orleans Parish Judicial District Court Building Commission (hereinafter referred to as the "**JBC**") is a public commission and a public corporation of the State of

Louisiana with the power to enter into contracts.  The JBC was created and established pursuant to Louisiana Revised Statutes, R.S. 13:996.67 (the "**Act**"), and has the powers and authority to transact its business and exercise its powers as is provided in the Act.  As a public corporation, the JBC is a citizen of the State of Louisiana having its principal office at 421 Loyola Avenue, Room 320, New Orleans, Louisiana.  The JBC has its own source of funds and the payment of any sums that might become due and owing because of this litigation would not come out of the state treasury.  *Moor v. County of Alameda*, 411 U.S. 693 (1973); *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994); and

b.      Judge Kern A. Reese is a judge of the Civil District Court for the Parish of Orleans and a permanent resident of the State of Louisiana, Parish of Orleans.  At all times relevant to the   matters set forth herein, Judge Reese was the Chairman of the JBC. In that capacity, he has always been engaged in purely administrative functions.  Under Louisiana law, the traditional immunity of judges for liability for damages for acts committed in the exercise of their jurisdiction has no application to a contest questioning a judge's administrative actions.  (*Imbornone v. Early,* 401 So. 2d 953 (La., 1981)); and

c.      Judge Christopher Bruno is a judge of the Civil District Court for the Parish of Orleans and a permanent resident of the State of Louisiana, Parish of Orleans.  At all times relevant to the matters set forth herein, Judge Bruno was a member of the Board of Commissioners of the JBC (hereinafter "Board") and a member of the JBC Executive Committee.   In that capacity, he has always been engaged in purely administrative functions.  Under Louisiana law, the traditional immunity of judges for liability for damages for acts committed in the exercise of their  jurisdiction has  no  application  to  a

contest questioning a judge's administrative actions. (*Imbornone v. Early*, 401 So. 2d 953 (La., 1981)).

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 in that this lawsuit involves a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

4.     Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391(b) because all of the defendants either maintain its principal place of business or are permanent residents of and domiciled in the Eastern District.  In addition, the acts or omissions complained of herein occurred within the Eastern District of Louisiana.  Defendants, the JBC and Judges Reese and Bruno, are either corporate bodies domiciled or doing business within the Eastern District of Louisiana or individuals who are residents of or have their domicile within the Eastern District of Louisiana.

## FACTS

5.     The obligation to provide suitable courtrooms and offices for all of the various courts in the parish of Orleans, including the Civil District Court, resides with the city of New Orleans pursuant to Louisiana Revised Statutes, R.S. 33:3714.

6.     However, the present Civil District Courthouse has been permitted to deteriorate to the point where the building is completely inadequate for the court's needs and is costly to maintain.

7.     Recognizing the need to build a new courthouse, the judges of the Civil District Court for the Parish of Orleans approached the state legislature in 2010 to pass an act that would create a building commission, which would undertake the task of constructing a new courthouse in

Orleans Parish.  This commission was empowered to increase the filing fees collected from litigants in order to create a source of funds to finance a new courthouse.

8.      Act No. 900 of 2010 created the Orleans Parish Judicial District Court Building Commission, Louisiana Revised Statutes, R.S. 13:996.67, which was initially given until August 15, 2014 to let public bids to construct or lease a new facility or lose the authority to levy and collect the additional fees.  Without the additional fees, it would be impossible to build a new courthouse.

9.      The Act provided that the JBC was a public corporation and a public commission.  It also established a Board of Commissioners to manage the affairs of the Commission.  It provided, "The judges, en banc, of the Civil District Court for the parish of Orleans shall serve as the board of commissioners thereof."  Presently the following judges are members of the Board by virtue of being judges of the Civil District Court for the Parish of Orleans: Judge Tiffany G. Chase, Judge Regina Bartholomew Woods, Judge Sidney H. Cates IV, Judge Nakisha Ervin-Knott, Judge Clare Jupiter, Judge Christopher J. Bruno, Judge Robin M. Giarrusso, Judge Monique Barial, Judge Piper D. Griffin, Judge Paula A. Brown, Judge Bernadette D'Souza, Judge Kern A. Reese, Judge Paulette R. Irons, and Judge Ethel S. Julien.

10.     By resolution of the Board of Commissioners, the judges of the First City Court of the City of New Orleans were appointed to the JBC.  The present Judges of the First City Court are Judge Monique G. Morial, Judge Angelique A. Reed, Judge Veronica E. Henry, and Judge E. "Teena" Anderson-Trahan.  As the Board of Commissioners never passed any bylaws and as the Act did not authorize the appointment of the First City Court Judges to the JBC, the validity of the appointment of these judges is almost certainly in doubt.  In addition, it is hard to imagine the utility or value of their appointment to the JBC as the Act does not provide for the collection by

the JBC of any enhanced fees from any litigant in that Court.  And, upon information and belief, these judges specifically refused to agree to the collection by the JBC of any enhanced fees. Their appointment, in addition to probably being unauthorized, made the governing process unwieldy and unpredictable because of the sheer size of the JBC and the diversity of experience and temperament that all eighteen judges that composed the Board of Commissioners brought to the process.  The Judges of the First City Court were probably de facto board members even though they were almost certainly not de jure board members.  They performed their duties and were acting under what they believed to be the authority of the resolution of the Board of Commissioners even though their appointment was in all probability invalid.  In short, they actually performed as Board Members.

11.     The JBC initially sought to build a new courthouse on a site in Duncan Plaza owned by the state.  Their efforts were defeated when Mayor Mitchell J. Landrieu did not facilitate the donation of the site to the city by the state.  When this effort failed, the JBC turned to the BioDistrict New Orleans to sell bonds and act as a developer for the new facility.  The district's board, which includes four members appointed by the Mayor, never approved the transaction.

12.     The Mayor has made plain his desire to consolidate City Hall and the Civil District Court into a civic complex in the former Charity Hospital building, which has been vacant since the landfall of Hurricane Katrina.  It has been estimated that repurposing the building would cost in excess of 400 million dollars.  The city of New Orleans does not have the funds to accomplish this purpose.  It, apparently, was looking to use the revenue stream generated by the JBC's additional fees collected from litigants.  The JBC requested that the architectural firm of Tate Snyder Kimsey determine whether the old hospital building would be suitable for a courthouse. This architectural firm is world renowned as the designer of courthouse facilities throughout the

world and is the recognized expert in the field.  The architects opined, "[Charity] is totally incapable of being converted to function as a courthouse.  I could not with good conscience recommend that New Orleans consider … Charity Hospital for use as a courthouse."

13.     In the fall of 2013, the JBC issued a Request for Qualifications seeking a private developer to construct a Courthouse to be located within the Central Business District of the City of New Orleans on a site designated by the JBC.  "The development team selected may be expected to provide turnkey services including: project finance, financial arranging, **site acquisition**, architectural design, construction, equipping, operating and maintaining." Additionally, the JBC expressed in the RFQ its intention to lease the completed facility.  It stated, "The JBC has the power to contract and administer the proceeds of the Fund for its intended purposes, including any lease, sublease or other financing agreement relating to the same."

14.     The Company responded to the JBC's RFQ, which was issued by the entire Commission. "The Civil District Court for the Parish of Orleans Judicial District Court Building Commission, a public commission of the State of Louisiana, (hereinafter "JBC") is soliciting statements of qualifications from interested parties to develop a new, freestanding Civil District Courthouse ("Project").  The Courthouse is to be located within the Central Business District of the City of New Orleans **on a site designated by the JBC.**"  As stated by the RFQ, the JBC had pre-selected sites to be analyzed for their possible use in building a new courthouse.  CFP included the Canal Street Site as one of the three site options that had been pre-selected by the JBC in its Interview Presentation.  The Presentation also included a time line for "Site Acquisition".  So, the entire Commission had previously decided upon the Canal Street Site as a possible location for a courthouse before any selection of a developer was ever made.  Further, it was informed of

the timeline for Site Acquisition as anticipated by CFP and as required by the RFQ.  By letter dated December 19, 2013, Mr. James Baker, Project Manager for the JBC, even specified that the JBC would provide a site plan for the courthouse.  "A 3-D site plan will be provided by me via email."  Copies of the letter were sent to Judge Kern Reese, Judge Monique Morial and Traci Dias, the JBC's, then, Executive Committee.  Copies of the letter were not sent to the entire Board.  Prior to the selection of a developer, the JBC evidenced that it had constructive, if not actual, knowledge of the possible sites and the site plan; it also directed and was aware of the timeline for site acquisition.  Further, Mr. Baker's letter created the appearance that the Executive Committee was authorized to act on behalf of the JBC.  Therefore, it should not have come as a surprise that Judge Reese and the Executive Committee, immediately upon selection of the developer, directed that control of a site for the new facility was the JBC's first priority.

16.     By letter dated February 18, 2014, CFP was informed that it was selected to provide development services on behalf of the JBC.  The letter was signed by Judge Kern A. Reese, the Chairman of the JBC.  When the JBC selected CFP, it was already aware of and approved the sites to be considered and the timeline for Site Acquisition.  Its employee, James Baker, created the appearance that the Executive Committee had the authority to act on behalf of the JBC.

17.     The deadline for letting a public bid or for entering into a lease before the JBC would lose its ability to continue to collect additional fees, by virtue of the legislation, was less than six months away.  The Company's representatives met with the Executive Committee of the JBC on March 11, 2014.  Because of the impending deadline, they were directed to secure land for the JBC project as soon as possible.  At that meeting, the Executive Committee composed of Judges Kern Reese and Monique Morial and Ms. Traci Dias, gave the Company's representatives the directive to approach owners of sites that had been preapproved by the JBC to begin negotiations

to secure a site for the courthouse.  Neither of the Judges or Ms. Dias ever expressed the need for the Executive Committee to obtain a corporate resolution from the Board before obtaining site control.

18.     At a March 18, 2014 meeting with Judge Reese, the Company's representatives were again directed to secure site control.  In attendance at that meeting were Rick Richter and Steve Klein, the JBC's legal counsel.  At no time, in the meeting, did legal counsel ever express the need for Judge Reese to obtain a written corporate resolution from the entire Board to authorize him to act on behalf of the JBC in obtaining control of the land.  Further, Judge Reese directed Mr. Richter to continue to secure a site as well.  Prior to the selection of CFP through the RFQ process, Mr. Richter had identified at least three sites that he brought to the Chairman of the JBC for his consideration as a location for a new courthouse.  At least one if not all of the sites involved other clients of Mr. Richter, which could have created an ethical conflict for Mr. Richter if any of them had been selected for consideration.  Upon information and belief, Mr. Richter identified these sites without first obtaining a written resolution from the Board of Commissioners giving the then Chairman the authority to gain site control.  Mr. Richter's efforts were unsuccessful and pre-dated the RFQ issued by the JBC.

19.     Upon information and belief, at no time in the process did Mr. Richter ever advise Judge Reese of the need for a written corporate resolution to empower either he or CFP to gain control of a real estate site.  The knowledge of an attorney is imputed to his client.  *Stevision v. Charles St. Dizier, Ltd.*, 9 So. 3d 978 (La. App. 3d Cir. 2009).  Therefore, Messrs. Richter's and Klein's knowledge with regard to the legal requirements necessary to authorize an agent to gain control over real property is imputed to Judge Reese, to the Executive Committee and to the Board of Commissioners of the JBC.  Likewise, their knowledge that Judge Reese was directing CFP and

legal counsel to gain control over real property was imputed to the Executive Committee and the Board.  Despite the knowledge of all of these parties, no one raised an issue with CFP regarding the directions issue by Judge Reese and the Executive Committee.  CFP acted in reliance upon the directions of the Executive Committee and Judge Reese and the approval of the Agreement (as hereinafter defined) by the JBC.  The JBC is estopped from denying the existence of the authority of either Judge Reese or the Executive Committee to direct the CFP to obtain site control over the Canal Street property.  The reliance of CFP was reasonable because of the previous efforts of Mr. Richter that gave the appearance that a resolution was unnecessary and because of the provisions of the RFQ regarding the pre-selection of the very site about which Judge Reese sought site control.  In addition, knowledge by CFP of the direction in the RFQ that the developer gain site acquisition and knowledge by the JBC of the timetable in the Interview Presentation that included a deadline for site acquisition made it reasonable for the Company to rely upon the appearance of authority created by the Board itself.  The directions given by the Executive Committee to obtain site control and the failure of legal counsel to advise of the need for a corporate resolution made it reasonable to rely upon the appearance of authority in Judge Reese created by the JBC.

20.     Further complicating the situation for CFP is the fact that the Board of Commissioners never passed any bylaws or issued any resolutions establishing the authority of the Chairman or of the Executive Committee.  CFP had no resort to any governance documents to guide it in its dealings with the JBC.  Messrs. Richter and Klein obviously never saw fit to advise its corporate client of the need for defining for itself and for others the powers of its officers or boards.  Nor did they provide for the rules of order that would prevail in the operation of the Commission and

the running of its meetings.  Other actions, opinions and recommendations of the two possibly fell below the standard of care of a legal counsel.

21.     Of the pre-selected sites by the JBC, attention became focused on the site on Canal Street that was owned by a company controlled by Mr. James Coleman.  Judge Reese met with Mr. Coleman on several occasions in order to assure Mr. Coleman that he had authority to act on behalf of the JBC and that the JBC was serious about constructing a courthouse on his site.  CFP representatives were present when Judge Reese made the representations to Mr. Coleman.  They relied upon those representations when they obtained site control over the Canal Street property. In addition, CFP's representatives knew that the Canal Street was one of the sites that had been pre-selected by the JBC.  They relied as well upon the JBC's pre-selection of this site, JBC's direction to engage in site control in the RFQ and JBC's knowledge of the timetable for site control set out in CFP's Interview Presentation when it moved forward on the directives of the Executive Committee and of Judge Reese.

22.     On May 6, 2014, representatives of the Company made a presentation to the members of the Board of the JBC wherein their approval was sought to authorize the Company to obtain site control of the Canal Street property.  The Board was informed that the Company had been directed to obtain site control over the Canal Street site by the Executive Committee and by Judge Reese.  No issue was raised with the Company by any Board Member at any time relative to the need for the passage of a corporate resolution to give Judge Reese or anyone else written authorization to obtain site control over the land needed for the courthouse.

23.     In a May 22, 2014 letter to Judge Reese, a Company representative recounted the efforts taken at the direction of Judge Reese and the Executive Committee to obtain site control. Specifically mentioned was the fact that, acting in reliance upon the directives of the Executive

Committee and Judge Reese, a deposit had been placed with the owners of the Canal Street site to obtain site control and that the Company representatives were at risk if the JBC did not move to complete the purchase of the site. Copies of the letter were sent to the other members of the Executive Committee and to Judge Griffin, the Chairman of the Court's Finance Committee. Again, no concerns were raised with the Company by any of the recipients of the letter about the site control efforts.

24.     On September 9, 2014, the Company's representatives were informed that the Board had met and had approved the Canal Street project. This meeting was four months after the initial site control and due diligence period was obtained by CFP. But for the Mayor's amendment of the Act to extend the deadline to August 15, 2015, the tardy action of the JBC would have resulted in a forfeiture of the enhanced fees because it occurred after the original deadline in the Act had passed. After this meeting and acting in reliance upon the approval by the Board, the owner of the Canal Street site was paid for an extension of the due diligence period through the end of the year. Additionally, the Company's representatives, in reliance upon the JBC's vote to approve the project on the Canal Street site, negotiated an extension of the due diligence period through August 15, 2015.

25.     Ultimately, a Professional Services Agreement (hereinafter "Agreement" or "PSA") was negotiated between the Company and the JBC. The Agreement was approved by the Executive Committee on November 19, 2014 and by the Board on December 8, 2014. Article XIII, Section 1 provides, "This Agreement is personal to each of the parties hereto, and neither party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party." Article XIII, Section 9 provides, "This Agreement is entered into for the exclusive benefit of the parties, and the parties expressly disclaim any intent to benefit anyone

not a party hereto."  Therefore, only CFP has the right and power to enforce the provisions of this Agreement.

26.     By this time, the Executive Committee was composed of Judges Reese, Morial, Bruno, and Cates and Ms. Traci Dias.  Even though Judge Bruno was appointed to the Executive Committee, he never attended any of its meetings; he was not present at this meeting.  Judge Cates, the other new Executive Committee member, was present at the November 19 meeting and was made aware of the site negotiations.  Judge Cates never expressed any problems with the actions of CFP or the need for obtaining a written resolution to authorize himself and the other members of the Executive Committee to approve the site selection activities of CFP.  The Agreement was signed by Judge Reese and by the Secretary of CFP on December 19, 2014.  The Agreement was made effective retroactive to the 18th day of February 2014.  The fourth "Whereas" clause of the Agreement stated, "JBC desires to acquire and to construct or cause to be constructed certain improvements on a portion of the Parent Tract (hereinafter the 'Property') for use as a new facility (the 'Facility') by the current occupants of the Orleans Parish Civil District Court complex."  The Property being referred to was the Canal Street property.  The entire Agreement, and the "Whereas" clause in particular, was viewed by the Company and its representatives as an acknowledgement that Judge Reese was authorized to direct the expenditure of funds to obtain site control over the land needed for the Facility.  Further, Article III, Section 3 of the Agreement provides, "During Phase 1, Company and JBC shall negotiate and enter into a definitive binding agreement for the purchase of the Property, on terms and conditions satisfactory to JBC in its sole discretion."  The retroactive nature of the Agreement serves to establish Judge Reese's and the Executive Committee's authorization retroactive to the first day that CFP began to provide services to the JBC.  In effect, the Agreement serves as a

ratification of the Judge's directions and the Company's efforts to obtain site control.   All subsequent activities of the Company and its representatives were taken in direct reliance upon the actions of the Executive Committee and the Board in approving the site control efforts directed by Judge Reese.

27.     In addition, the RFQ had specified that one of the duties of the entity selected to provide professional services was to include site acquisition.   It stated, "The development team selected may be expected to provide turnkey services including: project finance, financial arranging, **site acquisition**, architectural design, construction, equipping, operating and maintaining."   Further, Article III, Section 2, Paragraph A, Subparagraph 3 of the Agreement specified that, "During Phase 1, Company and JBC shall negotiate and enter into a definitive binding agreement for the purchase of the Property, on terms and conditions satisfactory to JBC in its sole discretion."   Site control was essential for the accomplishment of the negotiation of a purchase agreement.   The Company, therefore, was, acting in fulfillment of its obligation under the Agreement when it took the actions directed by Judge Reese and the Executive Committee in obtaining site control. Legal counsel for the JBC drafted the Agreement that effected the retroactive nature of the authority granted.

28.     Judge Reese had the express authority to direct the Company and its representatives to expend funds in order to obtain site control over the Canal Street property.   Upon information and belief, minutes of the meetings of the Board of Commissioners and of the Executive Committee are maintained by the JBC Secretary.   Those meetings should contain the resolutions made and voted upon by the Commissioners and the Committee.   When reduced to written form and signed by the Secretary, extracts of the resolutions would provide any written authorization needed to prove the authority of Judge Reese and the Executive Committee.

29.     In addition to express authority, Judge Reese had the apparent authority to direct the Company and its representatives as he did.  The doctrine of apparent authority or agency by estoppel can bar a principal from asserting the lack of written authority for a real estate transaction if the third person can show a change of position in reliance on the representation of the principal.  [*Nine-O-Five Royal Apartment v. Atkins,* 151 So. 3d 741 (C.A. 4th Cir. 2014)].  In this instance, representations were made in the RFQ, by the Executive Committee and by the Board through approval of the project and the Agreement.  Further, the Executive Committee, members of the Board and legal counsel all remained silent when provided with information that Judge Reese had directed the expenditure of funds to obtain site control.  CFP acted as well in reliance upon the lack of objection to the actions taken by Judge Reese and the Executive Committee and upon the retroactive nature of the authority granted to Judge Reese.

30.     Alternatively, if Judge Reese did not have express or apparent authority to direct CFP to take the steps that were taken to obtain site control, the Judge is himself liable for repayment of the funds expended.  This liability does not arise under the Agreement and the Judge is not being sued to enforce the terms of the Agreement or because of any breach of the Agreement.  Rather, Civil Code Article 3019 specifies that an agent who exceeds his authority is personally liable to any third party that he contracts with unless the third party had actual knowledge that the agent was exceeding his authority when he contracted with the party.  The Executive Committee as well directed the actions of CFP.  Liability arises by virtue of a violation of positive law found in Louisiana's Civil Code.

31.     In April of 2014, Mayor Landrieu began to push a bill that would give the JBC an additional year to collect higher fees before being required to let a public bid.  In an April 16, 2014 article in The Lens, Judge Reese is quoted as saying, "Through some back-channel

discussions, a request was made to keep an open mind.  We said, OK."  The Mayor's office explained that this was an attempt to provide the JBC with flexibility while he continued discussions regarding the adaptive reuse of Charity Hospital.

32.     The Company and its representatives recognized that this threatened their ability to obtain an Agreement with the JBC, as the Agreement had neither been drafted nor signed at this point. When approached for an explanation, Judge Reese informed the Company's representatives that the back channel that was being referred to was Judge Bruno.  They were told that Judge Bruno, a member of the Executive Committee, was trying to sabotage the JBC's efforts in order to benefit the Mayor.   As a member of the Board of Commissioners and of its Executive Committee, Judge Bruno had a fiduciary obligation to pursue the exclusive best interests of the public corporation.  Sabotaging the JBC's efforts to lease or build a new facility in order to force the court into a structure that did not satisfy its needs would not fulfill that obligation.  It would rather be detrimental to the best interests of the JBC, a breach of fiduciary duty and a dereliction of the Judge's duties as a member and officer of the board of a public corporation.

33.     Throughout the performance of the Professional Services Agreement, the CFP's representatives were made aware that the Mayor would only communicate through the back channel that was Judge Bruno.  Throughout the performance of the Agreement, Judge Bruno attended none of the meetings intended to obtain the information needed to design the courthouse and none of the meetings of the Executive Committee.  The Judge abandoned his responsibilities to the JBC in order to benefit the Mayor.  The Judge made the performance of the Professional Services Agreement difficult by disparaging the efforts of the CFP and its representatives and encouraging the other Board Members to resist the efforts of Judge Reese and the Executive Committee to build the facility.  He did this intentionally and without presenting an alternative

mechanism for constructing or leasing a replacement facility. Similar to Messrs. Richter and Klein who had other clients who could possibly benefit by another site location, Judge Bruno appeared to have an allegiance to someone other than the JBC. This possible allegiance to the Mayor, who had other plans, was probably in violation of his duties to the CFP and to the JBC. After all, the JBC, and Judge Bruno as one of its officers and a Board Member, had a duty of good faith and fair dealing to perform the contract with CFP honorably. Judge Bruno had a specific duty of good faith to CFP, which he intentionally breached. He continued his efforts to undermine Judge Reese's progress on the project even after the Mayor dropped his plans for Charity Hospital's redevelopment. In a June 16, 2014 article in Gambit, the Mayor is quoted as saying, "We cannot afford the project at this time." The Mayor estimated that it would cost "nearly $400 million" to rehab Charity Hospital.

34.     Through a letter dated October 19, 2015 but received some time after that date, CFP was informed that the JBC had met on October 13, 2015 and voted to terminate the Professional Services Agreement. No reason was given for the termination. The notice did not comply with Article X, Section 2 of the Agreement, which requires that a notice be sent to the Company at least thirty days prior to the date of termination. The JBC's legal counsel, Rick Richter, sent the notice, which did not contain the 30-day provision.

35.     Subsequent to the receipt of the letter, representatives of the Company met with Judge Reese on October 20, 2015. They were able to obtain information that the termination was a culmination of the intentional efforts of Judge Bruno to make the performance of the contract by CFP onerous and burdensome. Upon information and belief, Judge Bruno acted intentionally to breach CFP's contract with the JBC because he was told by the Mayor that the Mayor would be able to get the outgoing governor to donate the Duncan Plaza site to the city for use by the JBC.

That, obviously, never happened.  Upon information and belief, Judge Bruno has lately been describing himself as the Chairman of the JBC when in fact Judge Reese is still the Chairman.  It is possible Judge Bruno intended to have the other judges turn against Judge Reese and elect him the new chairperson.  In any event, Judge Bruno acted to interfere intentionally with CFP's contract with the JBC for a motive that was not designed to benefit the JBC.  Indeed, the JBC has been harmed through the present by Judge Bruno's actions.

36.     With the termination of the PSA, Judge Bruno has caused harm to the Company.  He has become liable to the Company for the damages caused by his intentional interference with its contractual relations with the JBC.  He has violated his duty of good faith and has caused the JBC to violate its duty.  The termination of the contract was contrary to the best interest of the JBC as it was facing an August 15, 2016 deadline to lease a facility or let a public bid and no alternative method for accomplishing the replacement of the old courthouse had been identified. [The Company, with the approval of Judge Reese, had been able to obtain an amendment that gave the JBC an additional year (until August 15, 2016) to lease or construct a new courthouse. The amendment also made it clear that leasing a courthouse would as well be a permitted means for invoking the increased fees set forth in the statute.]  Indeed, through the present, the JBC has taken no substantial efforts to replace the old courthouse.  The Mayor, not the JBC, undertook to have the Act amended again to extend the deadline for entering into a lease or letting a public bid until 2021.

37.     Despite this extension, the JBC has been harmed by Judge Bruno's intentional breach of his fiduciary duties and of his duty of good faith because the enhanced fees that could be charged for various civil filings and be collected by the JBC would have increased significantly once a lease was entered into or a public bid let.  The enhancement to the fees for civil filings would

have increased eight-fold while the enhancement due to the JBC for jury trials would double.  In addition, the enhancement for class actions would increase by one thousand dollars and the JBC could charge a new fee of ten dollars for any matter filed into a civil record.  The loss caused by Judge Bruno's actions is substantial both to the JBC and to the Company.  It, in effect, is a breach of the public trust.  The litigants and the users of the courthouse had the right to expect that the JBC would construct a new courthouse that would satisfy their needs.  The legislature imposed upon the JBC the duty to accomplish this task.  By interfering with CFP's contract with the JBC, Judge Bruno is guilty of a breach of the public trust and a dereliction of the duty imposed upon him by the legislature.  The Company is entitled to recover its development fee because of the intentional interference with its contract by Judge Bruno, a member of the Executive Committee of the JBC.  Judge Bruno acted without justification in that he did not act to benefit the JBC or with the JBC's best interests in mind.

38.     The vehicle established by the legislature was an effective one.  There have been at least four other judicial districts that have accomplished the construction of a new courthouse within four years after obtaining the right to charge enhanced fees.  The breach of public trust by Judge Bruno becomes more egregious when one realizes the extreme effectiveness of the vehicle established by the legislature to construct new courthouses.  It is instructive to compare what has been accomplished in other venues where politics did not override the mandate to benefit the public welfare to the consequences of the split allegiances that appear to have been present with the JBC.

39.     The last bill of the Company to the JBC was submitted on October 27, 2015 for $953,650.04.  That bill has remained unpaid despite amicable demand.  Under Civil Code Article 3014, the JBC owes interest from the date of the expenditure on sums expended by the Company

in the performance of its mandate.  In addition, the JBC must pay the Company interest on the sums due and owing to the Company from the time the sums became due, pursuant to Civil Code Article 2000.  Further, the JBC must pay the Company's attorney fees for the prosecution and collection of this claim pursuant to R.S. 9:2781.

### FIRST CAUSE OF ACTION AGAINST THE JBC FOR BREACH OF CONTRACT

40.     Plaintiff repeats and re-alleges each allegation set forth previously in the Complaint.

41.     CFP entered into a binding agreement with the JBC.  The Professional Services Agreement was entered into on December 19, 2014 to be effective as of the 18th day of February 2014.  Article XIII, Section 9 of the Agreement provides that it is entered into for the exclusive benefit of the parties, and the parties expressly disclaim any intent to benefit anyone not a party thereto.  Article XIII, Section 16 specifies, "The JBC and the Company acknowledge that nothing contained in this Agreement nor any act by the JBC or the Company shall be deemed or construed by any of them or any third person to create any relationship of principal and agent, limited or general partner, or joint venture between or among the JBC, the Company and/or any third party."  CFP has the exclusive right to bring this lawsuit against the JBC.

42.     CFP has performed all of the Phase 1 duties imposed upon it by the Agreement.  It was able to show that the fee enhancements allowed by the Act was adequate to cover debt service of the lease or construction of a new courthouse.  Therefore, it is entitled to be paid the second installment of the fee for Phase 1 services under the Professional Services Agreement.

43.     CFP submitted its invoice for services performed by its third party professional service providers.  CFP also submitted supporting documentation for this invoice.  It is entitled to be paid for the outstanding sums that are due and owing to its third party professionals.

44.     The Agreement specified that the JBC intended to purchase the Canal Street site upon which it would build its new courthouse.  CFP submitted its invoice for reimbursement of the sums expended by it to obtain control of the Canal Street site.  The expenditure of these funds was authorized by the Agreement.

43.     Alternatively, the JBC made numerous representations in its RFQ and through the Agreement that were relied upon by CFP in making the expenditures to obtain site control.  In addition, legal counsels for the JBC were aware that the Executive Committee and Judge Reese had authorized the expenditure of funds to gain site control.

44.     The knowledge of its counsel is imputed to the JBC.  Therefore, Messrs. Richter's and Klein's knowledge with regard to the legal requirements necessary to authorize an agent to gain control over real property is imputed to Judge Reese, to the Executive Committee and to the Board of Commissioners of the JBC.  Likewise, their knowledge that Judge Reese was directing CFP and legal counsel to gain control over real property was imputed to the Executive Committee and the Board.  CFP acted in reliance upon the directions of the Executive Committee and Judge Reese and the approval of the Agreement by the JBC.  The JBC is estopped from denying the existence of the authority of either Judge Reese or the Executive Committee.

45.     Architectural Services were invoiced on 12/1/14 for $223,037.07, and on 10/26/15 (originally invoiced 4/20/15 and later revised in October) for $275,071.49.  The total of architectural services invoiced is $498,108.56.  On 7/21/15 after the JBC raised concerns about the extra services the CFP billed for and about the multiplier that it used in calculating the bill, CFP agreed to accept a partial payment on the bill, and the JBC paid $343,451.33.  CFP agreed to provide support for payment of the remainder of the bill.

46.     By memorandum dated July 29, 2015, CFP provided extensive documentation for the accuracy and reasonableness of the bill.  (A copy of that memorandum is attached hereto as Exhibit "A").  A balance of $154,657.23 is now due for architectural services in addition to the sums due for development services, application deposit, land acquisition costs, and financial services.

47.     The last bill of the Company to the JBC was submitted on October 27, 2015 for $953,650.04.  That bill has remained unpaid.  Article X, Section 2 of the Agreement permits the JBC to terminate the Agreement without cause.  However, "In the event JBC elects to terminate for convenience, JBC shall be obligated to reimburse for all third party expenses incurred by Company under this Agreement up to and through the date of termination. Any fees for Services shall be equitably adjusted."  Further, the notice of termination was probably defective.  So, the contract was probably terminated in violation of the referenced provision.

48.     The sum of $953,650.04 represents the total of $250,000 as the second half of the Phase I Development Fee as set forth in the Agreement plus the third party expenses incurred by the Company that are due up to and through the date of termination.  The JBC is in breach of the Agreement because it has refused to pay these sums.

49.     CFP is entitled to recover the sum of $953,650.04 plus interest as provide for by law for breach of the Agreement by the JBC.  The Act provides that, "These monies deposited to the courthouse construction fund shall be dedicated to the design, planning, feasibility, acquisition, construction, equipping, operating, and maintaining a new facility to house the Civil District Court for the parish of Orleans …."  The services provided by CFP and the sums billed to the JBC were dedicated to the design, planning, feasibility, acquisition, construction and equipping of the new courthouse and are, therefore, authorized by and fit within the intendment of the Act.

## SECOND CAUSE OF ACTION AGAINST THE JBC FOR SUIT ON AN OPEN ACCOUNT

50.     The Agreement that CFP entered into with the JBC was one on an open account as it provided that, "The Services to be performed hereunder will be rendered and paid for in discrete phases." Article III, Section 2.

51.     This Agreement is evidenced by the attached Exhibit "B". JBC is truly indebted to CFP for Nine Hundred Fifty-Three Thousand Six Hundred Fifty Dollars and Four Cents ($953,650.04), together with legal interest, until finally paid, for reasonable attorney's fees, and for all costs of these proceedings.

52.     The JBC maintained an open account with the Company for services rendered and incurred charges as set forth on the itemized statement of account and/or invoices, which are attached and incorporated by reference as Exhibit "C".

53.     Despite amicable demand, the JBC has not paid the balance due on this account.

54.     In accordance with Louisiana Revised Statute, R.S. 9:2781, the JBC is hereby provided notice correctly setting forth the amount owed through the service of this Complaint. Therefore, the JBC has ten days within which to pay the complete amount of the sums due and owning or it will be liable unto the Company for its reasonable attorney's fees for bringing this action.

55.     CFP is entitled to recover a reasonable attorney fee for bringing this action pursuant to Louisiana Revised Statutes, R.S. 9:2781.

## THIRD CAUSE OF ACTION AGAINST JUDGE KERN A. REESE FOR BREACH OF AN IMPLIED CONTRACT

56.     In the event that this Honorable Court determines that Judge Reese did not have authority to direct the expenditure of some or all of the funds for site control, the Judge is himself liable for repayment of the funds expended. Civil Code Article 3019 specifies that an agent who

exceeds his authority is personally liable to any third party that he contracts with unless the third party had actual knowledge that the agent was exceeding his authority when he contracted with the party.  This liability arises from the statute and not out of any provisions of the Agreement. Judge Reese is not being sued based upon any default or breach of any obligation under the terms of the Agreement but rather because of his personal liability for violation of the Civil Code of Louisiana.

57.     CFP is entitled to recover from Judge Reese all sums up to and including the sum of $953, 650.04 plus interest as provided for by law.  Judge Reese is personally liable for any sums that are determined not to be owing by the JBC due to Judge Reese's violation of the Civil Code provision.

## FOURTH CAUSE OF ACTION AGAINST JUDGE CHRISTOPHER BRUNO FOR INTENTIONAL INTERFERENCE WITH CONTRCATUAL RELATIONS

58.     Plaintiff repeats and re-alleges each allegation set forth previously in the Complaint.

59.     Judge Bruno is a member of the Board of Commissioners and of the Executive Committee of the JBC.  As such, he is an officer of this public corporation.  Robert's Rules of Order, 10th Edition, provides that "Directors should usually be classified as officers."  (Page 555).

60.     Membership on the Board of Commissioners of this public corporation is the functional equivalent of being a director in a traditional corporation.   "The state and its political subdivisions have dual personality.  At times they act as public persons in a sovereign capacity and at times as private persons in the capacity of a citizen or **a private corporation."** [Comment (c) to Civil Code Article 24].   Further, the Executive Committee has the day-to-day responsibility to manage a corporation in the absence of the full board.  Additionally, Act 900 provides, "The judges, *en banc,* of the Civil District Court for the Parish of Orleans shall serve as

the board of commissioners thereof."  Acting *en banc,* every judge is functionally an officer of this public corporation.

61.     Louisiana R.S. 12:91, that was effective through January 1, 2015, provided, "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith ...."  Effective January 1, 2015, Louisiana R.S. 12:1-830 and R.S. 12:1-842 established the standards of conduct for directors and officers respectively.  Under the new legislation, both directors and officers must act shall act in good faith and in a manner the director or officer reasonably believes to be in the best interests of the corporation.  Officers and directors have the same duties as regard the corporation and, therefore, are subject to the same cause of action for intentional interference with contractual relations.

62.     The JBC is a public corporation of the State of Louisiana.

63.     A binding contract existed between the JBC and the Company prior to October 13, 2015. It was entered into effective February 18, 2014.

64.     Judge Bruno was aware of the existence of the binding contract.

65.     Judge Bruno owed a fiduciary duty to the JBC to act in the exclusive best interests of the JBC in the performance of his duties to the JBC and to the public.

66.     Judge Bruno intentionally interfered with the contract of the Company with the JBC to make its performance more burdensome.  Judge Bruno did not have a reasonable belief that his action was for the benefit of the JBC.  He knowingly and intentionally acted against the best interest of the JBC and can therefore be held liable for the harm caused to CFP by his actions.

67.     Judge Bruno's actions were detrimental to the interests of the JBC, a dereliction of his duties as a public officer and a breach of the public trust.  He was also in breach of his duty to

perform the contract with CFP in good faith.  There was no justification for the acts of Judge Bruno, as he did not act in the best interests of the JBC.

68.     Judge Bruno's actions caused harm to the JBC and to CFP.  Judge Bruno induced his fellow board members to terminate the Agreement with CFP after having made the performance of the contract more burdensome.  Because of the induced termination, CFP has lost its development Judge Bruno is his breach of fiduciary duty to the JBC without justification and his breach of duty to the CFP to perform its contract in good faith, which resulted in interference with the contractual relations of CFP with the JBC.

69.     The Company is entitled to recover for the harm caused to it.  The Company is entitled to its usual and customary developer's fee of 4% of the total cost of the development.

70.     Judge Bruno is indebted in the sum of $4.48 million to CFP for the harm caused to it by Judge Bruno's interference with the Company's contractual relations with the JBC by making the Company's performance more difficult and burdensome.  Judge Bruno is being sued in tort and not pursuant to any claim or cause of action in contract.

## PRAYER FOR RELIEF

**WHEREFORE,** Community Facility Partners, LLC prays for judgment in its favor and against Defendants, the Orleans Parish Judicial District Court Building Commission, Judge Kern A. Reese and Judge Christopher Bruno, and for the relief that follows:

a.      That Community Facility Partners, LLC be awarded the sum of $953,650.04 plus interest as provide for by law for breach of the Agreement by the Orleans Parish Judicial District Court Building Commission on the First Cause of Action;

b.      That Community Facility Partners, LLC be awarded a reasonable attorney fee for bringing this action pursuant to Louisiana Revised Statutes, R.S. 9:2781 on the Second Cause of

Action;

      c.      That Community Facility Partners, LLC be awarded from Judge Reese all sums up to and including the sum of $953,650.04 plus interest as provide by law for any sums that are determined not to be owing by the JBC due to Judge Reese's lack of authority to bind the JBC on the Third Cause of Action;

      d.      That Community Facility Partners, LLC be awarded from Judge Bruno the sum of $4.48 million to CFP for the harm caused to it by Judge Bruno's interference with the Company's contractual relations with the JBC on the Fourth Cause of Action.

      e.      That Community Facility Partners, LLC be awarded the cost of prosecuting this claim;

      f.      That Community Facility Partners, LLC be awarded such other and further legal or equitable relief that is appropriate in the premises.

Respectfully submitted,

**/s/ Richard A. Goins**
**RICHARD A. GOINS, #6082, T.A.**
650 Poydras Street, Suite 2715
New Orleans, Louisiana  70130
Telephone: (504) 596-2455
Facsimile:  (504) 529-7197
rgoins@swslaw.com