UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CFP NEW ORLEANS, LLC                                           CIVIL ACTION

VERSUS                                                        NO. 16-15474

ORLEANS PARISH JUDICIAL                                        SECTION "N"- KDE -JVM
DISTRICT COURT BUILDING
COMMISSION, JUDGE KERN REESE,
AND JUDGE CHRISTOPHER BRUNO

<u>**ORDER AND REASONS**</u>

Presently before the Court are motions to dismiss that were filed, pursuant to Rule 12(b)(6)

of the Federal Rule of Civil Procedure 12(b)(6), by Defendant Judge Christopher Bruno (Rec. Doc.

6) and Defendant Judge Kern Reese (Rec. Doc. 7). Plaintiff CFP New Orleans, LLC ("CFP")

opposes the motions. Having carefully considered the parties' submissions, the record, and

applicable law, **IT IS ORDERED** that the motions to dismiss (Rec. Docs. 6 and 7) are

**GRANTED**. **IT IS FURTHER ORDERED** that Plaintiff CFP's claims against Defendants

Bruno and Reese are **DISMISSED WITH PREJUDICE**.

I.      **BACKGROUND**

In 2010, the Louisiana Legislature passed Act No. 900 of 2010, Louisiana Revised Statute

13:996.67 (hereinafter, the "Act"), which created the Orleans Parish Judicial District Court

Building Commission (hereinafter, "JBC") for the purposes of funding and constructing a new

courthouse. *See* La. R.S. 13:996.97. Pursuant to the Act, "the Civil District Court for the parish of Orleans and the clerk of court of the Civil District Court for the parish of Orleans are hereby authorized to impose [specified] additional costs of court and service charges," which are:

> dedicated to the design, planning, feasibility, acquisition, construction, equipping, operating, and maintaining a new facility to house the Civil District Court for the parish of Orleans, the offices of the clerk of court for Civil District Court for the parish of Orleans, the First City Court, the clerk of the First City Court, the constable of the First City Court, the office of the civil sheriff, the Orleans Parish Juvenile Court, the mortgage office, the conveyance office, the notarial archives, and such other courts and parochial offices as may be necessary.

*Id.*

> As established by the Act, the JBC is "deemed to be a public commission" that is:

> a public corporation with power to contract, administer the proceeds of the costs and charges authorized in this Section, lease, sublease, and otherwise provide for the construction, equipping, maintenance, and operation of a new courthouse for the Civil District Court for the parish of Orleans and to pledge and dedicate the receipts of the courthouse construction fund created hereby for the payment of any lease or sublease obligation, loan agreement, or other financing agreement relative thereto.

*Id.* at §996.67(C)(1). The judges, *en banc,* of the Civil District Court for the Parish of Orleans comprise the JBC Board of Commissioners (hereinafter, the "Board"). *Id.* The Act also provides for the JBC to elect a chairman and vice chairman. *Id.* at §996.67(C)(2). The secretary-treasurer is the judicial administrator for the Parish of Orleans. *Id.* Pursuant to the Act, the JBC was initially given until August 15, 2014, to let public bids to construct or lease a new facility or lose the authority to levy and collect the additional fees. That date has been extended until August 15, 2021. *Id.* at §996.67(D).

According to the complaint: "Without the additional fees, it would be impossible to build a new courthouse."[1] The complaint additionally provides, in pertinent part:[2]

---

[1]     *See* Rec. Doc. 1, at ¶ 8.
[2]     *See* Rec. Doc. 1.

[2]b.   Judge Kern A. Reese is a judge of the Civil District Court for the Parish of Orleans and a permanent resident of the State of Louisiana, Parish of Orleans. At all times relevant to the matters set forth herein, Judge Reese was the Chairman of the JBC. In that capacity, he has always been engaged in purely administrative functions. Under Louisiana law, the traditional immunity of judges for liability for damages for acts committed in the exercise of their jurisdiction has no application to a contest questioning a judge's administrative actions.  (*Imbornone v. Early,* 401 So. 2d 953 (La. 1981)); and

[2]c.   Judge Christopher Bruno is a judge of the Civil District Court for the Parish of Orleans and a permanent resident of the State of Louisiana, Parish of Orleans. At all times relevant to the matters set forth herein, Judge Bruno was a member of the Board of Commissioners of the JBC (hereinafter "Board") and a member of the JBC Executive Committee. In that capacity, he has always been engaged in purely administrative functions. Under Louisiana law, the traditional immunity of judges for liability for damages for acts committed in the exercise of their jurisdiction has no application to a contest questioning a judge's administrative actions. (*Imbornone v. Early,* 401 So. 2d 953 (La. 1981)).

\* \* \*

5.      The obligation to provide suitable courtrooms and offices for all of the various courts in the parish of Orleans, including the Civil District Court, resides with the city of New Orleans pursuant to Louisiana Revised Statutes, R.S. 33:3714.

\* \* \*

9.      [] Presently the following judges are members of the Board by virtue of being judges of the Civil District Court for the Parish of Orleans: Judge Tiffany G. Chase, Judge Regina Bartholomew Woods, Judge Sidney H. Cates IV, Judge Nakisha Ervin-Knott, Judge Clare Jupiter, Judge Christopher J. Bruno, Judge Robin M. Giarrusso, Judge Monique Barial, Judge Piper D. Griffin, Judge Paula A. Brown, Judge Bernadette D'Souza, Judge Kern A. Reese, Judge Paulette R. Irons, and Judge Ethel S. Julien.

10.     By resolution of the Board of Commissioners, the judges of the First City Court of the City of New Orleans were appointed to the JBC. [] As the Board of Commissioners never passed any bylaws and as the Act did not authorize the appointment of the First City Court Judges to the JBC, the validity of the appointment of these judges is almost certainly in doubt. [] Their appointment, in addition to probably being unauthorized, made the governing process unwieldy and unpredictable because of the sheer size of the JBC and the diversity of experience and temperament that all eighteen judges that composed the Board of Commissioners brought to the process. The Judges of the First City Court [] actually performed as Board Members.

11.     The JBC initially sought to build a new courthouse on a site in Duncan Plaza owned by the state. Their efforts were defeated when Mayor Mitchell J. Landrieu did not facilitate the donation of the site to the city by the state. []

12.     The Mayor has made plain his desire to consolidate City Hall and the Civil District Court into a civic complex in the former Charity Hospital building, which has been vacant since the landfall of Hurricane Katrina. It has been estimated that repurposing the building would cost in excess of 400 million dollars. The city of New Orleans does not have the funds to accomplish this purpose. It, apparently, was looking to use the revenue stream generated by the JBC's additional fees collected from litigants. The JBC requested that the architectural firm of Tate Snyder Kimsey determine whether the old hospital building would be suitable for a courthouse. This architectural firm is world renowned as the designer of courthouse facilities throughout the world and is the recognized expert in the field. The architects opined, "[Charity] is totally incapable of being converted to function as a courthouse. I could not with good conscience recommend that New Orleans consider . . . Charity Hospital for use as a courthouse."

13.     In the fall of 2013, the JBC issued a Request for Qualification ["RFQ"] seeking a private developer to construct the new Courthouse to be located within the Central Business District on a site designated by the JBC. "The development team selected may be expected to provide turnkey services including: project finance, financial arranging, site acquisition, architectural design, construction, equipping, operating and maintaining." Additionally, the JBC expressed in the RFQ its intention to lease the completed facility. It stated, "The JBC has the power to contract and administer the proceeds of the Fund for its intended purposes, including any lease, sublease or other financing agreement relating to the same."

14.     The Company responded to the JBC's RFQ, which was issued by the entire Commission. "The Civil District Court for the Parish of Orleans Judicial District Court Building Commission, a public commission of the State of Louisiana, (hereinafter "JBC") is soliciting statements of qualifications from interested parties to develop a new, freestanding Civil District Courthouse ("Project"). The Courthouse is to be located within the Central Business District of the City of New Orleans on a site designated by the JBC." As stated by the RFQ, the JBC had pre-selected sites to be analyzed for their possible use in building a new courthouse. CFP included the Canal Street Site as one of the three site options that had been pre-selected by the JBC in its Interview Presentation. The Presentation also included a time line for "Site Acquisition." So, the entire Commission had previously decided upon the Canal Street Site as a possible location for a courthouse before any selection of a developer was ever made. Further, it was informed of the timeline for Site Acquisition as anticipated by CFP and as required by the RFQ. By letter dated December 19, 2013, Mr. James Baker, Project Manager for the JBC, even specified that the JBC would provide a site plan for the courthouse. "A 3-D site plan will be provided by me via email." Copies of the letter were sent to Judge

Kern Reese, Judge Monique Morial and Traci Dias, the JBC's, then, Executive Committee. Copies of the letter were not sent to the entire Board. Prior to the selection of a developer, the JBC evidenced that it had constructive, if not actual, knowledge of the possible sites and the site plan; it also directed and was aware of the timeline for site acquisition. Further, Mr. Baker's letter created the appearance that the Executive Committee was authorized to act on behalf of the JBC. Therefore, it should not have come as a surprise that Judge Reese and the Executive Committee, immediately upon selection of the developer, directed that control of a site for the new facility was the JBC's first priority.

16.    By letter dated February 18, 2014, CFP was informed that it was selected to provide development services on behalf of the JBC. The letter was signed by Judge Kern A. Reese, the Chairman of the JBC. When the JBC selected CFP, it was already aware of and approved the sites to be considered and the timeline for Site Acquisition. Its employee, James Baker, created the appearance that the Executive Committee had the authority to act on behalf of the JBC.

17.    The deadline for letting a public bid or for entering into a lease before the JBC would lose its ability to continue to collect additional fees, by virtue of the legislation, was less than six months away [August 15, 2014]. The Company's representatives met with the Executive Committee of the JBC on March 11, 2014. Because of the impending deadline, they were directed to secure land for the JBC project as soon as possible. At that meeting, the Executive Committee composed of Judges Kern Reese and Monique Morial and Ms. Traci Dias, gave the Company's representatives the directive to approach owners of sites that had been preapproved by the JBC to begin negotiations to secure a site for the courthouse. Neither of the Judges or Ms. Dias ever expressed the need for the Executive Committee to obtain a corporate resolution from the Board before obtaining site control.

18.    At a March 18, 2014 meeting with Judge Reese, the Company's representatives were again directed to secure site control. In attendance at that meeting were Rick Richter and Steve Klein, the JBC's legal counsel. At no time, in the meeting, did legal counsel ever express the need for Judge Reese to obtain a written corporate resolution from the entire Board to authorize him to act on behalf of the JBC in obtaining control of the land. Further, Judge Reese directed Mr. Richter to continue to secure a site as well. []

19.    Upon information and belief, at no time in the process did Mr. Richter ever advise Judge Reese of the need for a written corporate resolution to empower either he or CFP to gain control of a real estate site. The knowledge of an attorney is imputed to his client. *Stevision v. Charles St. Dizier*, Ltd., 9 So. 3d 978 (La. App. 3d Cir. 2009). Therefore, Messrs. Richter's and Klein's knowledge with regard to the legal requirements necessary to authorize an agent to gain control over real property is imputed to Judge Reese, to the Executive Committee and to the Board of Commissioners of the JBC. Likewise, their knowledge that Judge Reese was directing CFP and legal counsel to gain control over real property was imputed to

the Executive Committee and the Board. Despite the knowledge of all of these parties, no one raised an issue with CFP regarding the directions issue by Judge Reese and the Executive Committee. CFP acted in reliance upon the directions of the Executive Committee and Judge Reese and the approval of the Agreement (as hereinafter defined) by the JBC. The JBC is estopped from denying the existence of the authority of either Judge Reese or the Executive Committee to direct the CFP to obtain site control over the Canal Street property. The reliance of CFP was reasonable because of the previous efforts of Mr. Richter that gave the appearance that a resolution was unnecessary and because of the provisions of the RFQ regarding the pre-selection of the very site about which Judge Reese sought site control. In addition, knowledge by CFP of the direction in the RFQ that the developer gain site acquisition and knowledge by the JBC of the timetable in the Interview Presentation that included a deadline for site acquisition made it reasonable for the Company to rely upon the appearance of authority created by the Board itself. The directions given by the Executive Committee to obtain site control and the failure of legal counsel to advise of the need for a corporate resolution made it reasonable to rely upon the appearance of authority in Judge Reese created by the JBC.

20.     Further complicating the situation for CFP is the fact that the Board of Commissioners never passed any bylaws or issued any resolutions establishing the authority of the Chairman or of the Executive Committee. CFP had no resort to any governance documents to guide it in its dealings with the JBC. Messrs. Richter and Klein obviously never saw fit to advise its corporate client of the need for defining for itself and for others the powers of its officers or boards. Nor did they provide for the rules of order that would prevail in the operation of the Commission and the running of its meetings. Other actions, opinions and recommendations of the two possibly fell below the standard of care of a legal counsel.

21.     Of the pre-selected sites by the JBC, attention became focused on the site on Canal Street that was owned by a company controlled by Mr. James Coleman. Judge Reese met with Mr. Coleman on several occasions in order to assure Mr. Coleman that he had authority to act on behalf of the JBC and that the JBC was serious about constructing a courthouse on his site. CFP representatives were present when Judge Reese made the representations to Mr. Coleman. They relied upon those representations when they obtained site control over the Canal Street property. In addition, CFP's representatives knew that the Canal Street was one of the sites that had been pre-selected by the JBC. They relied as well upon the JBC's pre-selection of this site, JBC's direction to engage in site control in the RFQ and JBC's knowledge of the timetable for site control set out in CFP's Interview Presentation when it moved forward on the directives of the Executive Committee and of Judge Reese.

22.     On May 6, 2014, representatives of the Company made a presentation to the members of the Board of the JBC wherein their approval was sought to authorize the Company to obtain site control of the Canal Street property. The Board was

informed that the Company had been directed to obtain site control over the Canal Street site by the Executive Committee and by Judge Reese. No issue was raised with the Company by any Board Member at any time relative to the need for the passage of a corporate resolution to give Judge Reese or anyone else written authorization to obtain site control over the land needed for the courthouse.

23.     In a May 22, 2014 letter to Judge Reese, a Company representative recounted the efforts taken at the direction of Judge Reese and the Executive Committee to obtain site control. Specifically mentioned was the fact that, acting in reliance upon the directives of the Executive Committee and Judge Reese, a deposit had been placed with the owners of the Canal Street site to obtain site control and that the Company representatives were at risk if the JBC did not move to complete the purchase of the site. Copies of the letter were sent to the other members of the Executive Committee and to Judge Griffin, the Chairman of the Court's Finance Committee. Again, no concerns were raised with the Company by any of the recipients of the letter about the site control efforts.

24.     On September 9, 2014, the Company's representatives were informed that the Board had met and had approved the Canal Street project. This meeting was four months after the initial site control and due diligence period was obtained by CFP. But for the Mayor's amendment of the Act to extend the deadline to August 15, 2015, the tardy action of the JBC would have resulted in a forfeiture of the enhanced fees because it occurred after the original deadline in the Act had passed. After this meeting and acting in reliance upon the approval by the Board, the owner of the Canal Street site was paid for an extension of the due diligence period through the end of the year. Additionally, the Company's representatives, in reliance upon the JBC's vote to approve the project on the Canal Street site, negotiated an extension of the due diligence period through August 15, 2015.

25.     Ultimately, a Professional Services Agreement (hereinafter "Agreement" or "PSA") was negotiated between the Company and the JBC. The Agreement was approved by the Executive Committee on November 19, 2014 and by the Board on December 8, 2014. Article XIII, Section 1 provides, "This Agreement is personal to each of the parties hereto, and neither party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party." Article XIII, Section 9 provides, "This Agreement is entered into for the exclusive benefit of the parties, and the parties expressly disclaim any intent to benefit anyone not a party hereto." Therefore, only CFP has the right and power to enforce the provisions of this Agreement.

26.     By this time, the Executive Committee was composed of Judges Reese, Morial, Bruno, and Cates and Ms. Traci Dias. Even though Judge Bruno was appointed to the Executive Committee, he never attended any of its meetings; he was not present at this meeting. Judge Cates, the other new Executive Committee member, was present at the November 19 meeting and was made aware of the site negotiations.  Judge Cates never expressed any problems with the actions of CFP

or the need for obtaining a written resolution to authorize himself and the other members of the Executive Committee to approve the site selection activities of CFP. The Agreement was signed by Judge Reese and by the Secretary of CFP on December 19, 2014. The Agreement was made effective retroactive to the 18th day of February 2014. The fourth "Whereas" clause of the Agreement stated, "JBC desires to acquire and to construct or cause to be constructed certain improvements on a portion of the Parent Tract (hereinafter the 'Property') for use as a new facility (the 'Facility') by the current occupants of the Orleans Parish Civil District Court complex." The Property being referred to was the Canal Street property. The entire Agreement, and the "Whereas" clause in particular, was viewed by the Company and its representatives as an acknowledgement that Judge Reese was authorized to direct the expenditure of funds to obtain site control over the land needed for the Facility. Further, Article III, Section 3 of the Agreement provides, "During Phase 1, Company and JBC shall negotiate and enter into a definitive binding agreement for the purchase of the Property, on terms and conditions satisfactory to JBC in its sole discretion." The retroactive nature of the Agreement serves to establish Judge Reese's and the Executive Committee's authorization retroactive to the first day that CFP began to provide services to the JBC. In effect, the Agreement serves as a ratification of the Judge's directions and the Company's efforts to obtain site control. All subsequent activities of the Company and its representatives were taken in direct reliance upon the actions of the Executive Committee and the Board in approving the site control efforts directed by Judge Reese.

27.     In addition, the RFQ had specified that one of the duties of the entity selected to provide professional services was to include site acquisition. It stated, "The development team selected may be expected to provide turnkey services including: project finance, financial arranging, site acquisition, architectural design, construction, equipping, operating and maintaining." Further, Article III, Section 2, Paragraph A, Subparagraph 3 of the Agreement specified that, "During Phase 1, Company and JBC shall negotiate and enter into a definitive binding agreement for the purchase of the Property, on terms and conditions satisfactory to JBC in its sole discretion." Site control was essential for the accomplishment of the negotiation of a purchase agreement. The Company, therefore, was, acting in fulfillment of its obligation under the Agreement when it took the actions directed by Judge Reese and the Executive Committee in obtaining site control. Legal counsel for the JBC drafted the Agreement that effected the retroactive nature of the authority granted.

28.     Judge Reese had the express authority to direct the Company and its representatives to expend funds in order to obtain site control over the Canal Street property.  Upon information and belief, minutes of the meetings of the Board of Commissioners and of the Executive Committee are maintained by the JBC Secretary.  Those meetings should contain the resolutions made and voted upon by the Commissioner and the Committee.  When reduced to written form and signed by the Secretary, extracts of the resolutions would prove any written authorization needed to prove the authority of Judge Reese and the Executive Committee.

30.     Alternatively, if Judge Reese did not have express or apparent authority to direct CFP to take the steps that were taken to obtain site control, the Judge is himself liable for repayment of the funds expended.  This liability does not arise under the Agreement and the Judge is not being sued to enforce the terms of the Agreement or because of any breach of the Agreement.  Rather Civil Code Article 3019 specifies that an agent who exceeds his authority is personally liable to any third party that he contracts with unless the third party had actual knowledge that the agent was exceeding his authority when he contracted with the party.  The Executive Committee as well directed the actions of the CFP.  Liability arises by virtue of a violation of positive law found in Louisiana's Civil Code.

31.     In April of 2014, Mayor Landrieu began to push a bill that would give the JBC an additional year to collect higher fees before being required to let a public bid. In an April 16, 2014 article in The Lens, Judge Reese is quoted as saying, "Through some back-channel discussions, a request was made to keep an open mind. We said, OK." The Mayor's office explained that this was an attempt to provide the JBC with flexibility while he continued discussions regarding the adaptive reuse of Charity Hospital.

32.     The Company and its representatives recognized that this threatened their ability to obtain an Agreement with the JBC, as the Agreement had neither been drafted nor signed at this point. When approached for an explanation, Judge Reese informed the Company's representatives that the back channel that was being referred to was Judge Bruno. They were told that Judge Bruno, a member of the Executive Committee, was trying to sabotage the JBC's efforts in order to benefit the Mayor. As a member of the Board of Commissioners and of its Executive Committee, Judge Bruno had a fiduciary obligation to pursue the exclusive best interests of the public corporation. Sabotaging the JBC's efforts to lease or build a new facility in order to force the court into a structure that did not satisfy its needs would not fulfill that obligation.  It would rather be detrimental to the best interests of the JBC, a breach of fiduciary duty and a dereliction of the Judge's duties as a member and officer of the board of a public corporation.

33.     Throughout the performance of the [] Agreement, CFP's representatives were made aware that the Mayor would only communicate through the back channel that was Judge Bruno. Throughout the performance of the Agreement, Judge Bruno attended none of the meetings intended to obtain the information needed to design the courthouse and none of the meetings of the Executive Committee. The Judge abandoned his responsibilities to the JBC in order to benefit the Mayor. The Judge made the performance of the [] Agreement difficult by disparaging the efforts of the CFP and its representatives and encouraging the other Board Members to resist the efforts of Judge Reese and the Executive Committee to build the facility. He did this intentionally and without presenting an alternative mechanism for constructing or leasing a replacement facility. Similar to Messrs.

Richter and Klein who had other clients who could possibly benefit by another site location, Judge Bruno appeared to have an allegiance to someone other than the JBC. This possible allegiance to the Mayor, who had other plans, was probably in violation of his duties to the CFP and to the JBC. After all, the JBC, and Judge Bruno as one of its officers and a Board Member, had a duty of good faith and fair dealing to perform the contract with CFP honorably. Judge Bruno had a specific duty of good faith to CFP, which he intentionally breached. He continued his efforts to undermine Judge Reese's progress on the project even after the Mayor dropped his plans for Charity Hospital's redevelopment. In a June 16, 2014 article in Gambit, the Mayor is quoted as saying, "We cannot afford the project at this time." The Mayor estimated that it would cost "nearly $400 million" to rehab Charity Hospital.

34.     Through a letter dated October 19, 2015 but received some time after that date, CFP was informed that the JBC had met on October 13, 2015 and voted to terminate the [] Agreement. No reason was given for the termination. The notice did not comply with Article X, Section 2 of the Agreement, which requires that a notice be sent to the Company at least thirty days prior to the date of termination. The JBC's legal counsel, Rick Richter, sent the notice, which did not contain the 30-day provision.

35.     Subsequent to the receipt of the letter, representatives of the Company met with Judge Reese on October 20, 2015. They were able to obtain information that the termination was a culmination of the intentional efforts of Judge Bruno to make the performance of the contract by CFP onerous and burdensome. Upon information and belief, Judge Bruno acted intentionally to breach CFP's contract with the JBC because he was told by the Mayor that the Mayor would be able to get the outgoing governor to donate the Duncan Plaza site to the city for use by the JBC. That, obviously, never happened. Upon information and belief, Judge Bruno has lately been describing himself as the Chairman of the JBC when in fact Judge Reese is still the Chairman. It is possible Judge Bruno intended to have the other judges turn against Judge Reese and elect him the new chairperson. In any event, Judge Bruno acted to interfere intentionally with CFP's contract with the JBC for a motive that was not designed to benefit the JBC. Indeed, the JBC has been harmed through the present by Judge Bruno's actions.

36.     With the termination of the PSA, Judge Bruno has caused harm to the Company. He has become liable to the Company for the damages caused by his intentional interference with its contractual relations with the JBC. He has violated his duty of good faith and has caused the JBC to violate its duty. The termination of the contract was contrary to the best interest of the JBC as it was facing an August 15, 2016 deadline to lease a facility or let a public bid and no alternative method for accomplishing the replacement of the old courthouse had been identified. [The Company, with the approval of Judge Reese, had been able to obtain an amendment that gave the JBC an additional year (until August 15, 2016) to lease or construct a new courthouse. The amendment also made it clear that leasing a courthouse would

as well be a permitted means for invoking the increased fees set forth in the statute.] Indeed, through the present, the JBC has taken no substantial efforts to replace the old courthouse. The Mayor, not the JBC, undertook to have the Act amended again to extend the deadline for entering into a lease or letting a public bid until 2021.

37.     Despite this extension, the JBC has been harmed by Judge Bruno's intentional breach of his fiduciary duties and of his duty of good faith because the enhanced fees that could be charged for various civil filings and be collected by the JBC would have increased significantly once a lease was entered into or a public bid let. The enhancement to the fees for civil filings would have increased eight-fold while the enhancement due to the JBC for jury trials would double. In addition, the enhancement for class actions would increase by one thousand dollars and the JBC could charge a new fee of ten dollars for any matter filed into a civil record. The loss caused by Judge Bruno's actions is substantial both to the JBC and to the Company. It, in effect, is a breach of the public trust. The litigants and the users of the courthouse had the right to expect that the JBC would construct a new courthouse that would satisfy their needs. The legislature imposed upon the JBC the duty to accomplish this task. By interfering with CFP's contract with the JBC, Judge Bruno is guilty of a breach of the public trust and a dereliction of the duty imposed upon him by the legislature. The Company is entitled to recover its development fee because of the intentional interference with its contract by Judge Bruno, a member of the Executive Committee of the JBC. Judge Bruno acted without justification in that he did not act to benefit the JBC or with the JBC's best interests in mind.

38.     The vehicle established by the legislature was an effective one. There have been at least four other judicial districts that have accomplished the construction of a new courthouse within four years after obtaining the right to charge enhanced fees. The breach of public trust by Judge Bruno becomes more egregious when one realizes the extreme effectiveness of the vehicle established by the legislature to construct new courthouses. It is instructive to compare what has been accomplished in other venues where politics did not override the mandate to benefit the public welfare to the consequences of the split allegiances that appear to have been present with the JBC.  []

Following the October 2015 termination of the Professional Services Agreement (hereinafter "PSA" or "Agreement"),[3] CFP filed this action against Defendants JBC, Judge Bruno, and Judge Reese on October 13, 2016.  In it, CFP alleges claims for breach of contract and open account against JBC in the amount of $953,650.04, which is the amount of the unpaid last bill

---

[3]     *See* Rec. Doc. 1, ¶25.

submitted to JBC, on October 27, 2015, plus interest.[4]  The sum of $953,650.04, represents the total of $250,000, as the second half of the Phase I Development Fee set forth in the Agreement, plus the third party expenses incurred by CFP up to and through the date of termination of the Agreement.  CFP also seeks an award of attorney's fees against JBC pursuant to Louisiana Revised Statute 9:2781.

With respect to its claims against Judges Reese and Bruno, CFP alleges that Judge Reese is personally liable, pursuant to Louisiana Civil Code article 3019, for the same $953,650.04 it seeks to recover from JBC.[5]  CFP asserts a tortious interference with a contract claim against Judge Bruno, seeking an award of $4.48 million, which represents CFP's usual and customary developer's fee of 4% of the total cost of the courthouse development that CFP contracted to perform for the JBC.[6]  The instant motions to dismiss, filed by Defendant Judge Reese and Defendant Judge Bruno, followed.

## II.    LAW AND ANALYSIS

### A.  Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedures authorizes the filing of motions to dismiss asserting, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326 (1989). Dismissal under Rule 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[4]        *See* Rec. Doc. 1, ¶39.
[5]        *See* Rec. Doc. 1, ¶56.
[6]        *See* Rec. Doc. 1, ¶¶ 69-70.

Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—"that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 678 (quoting Fed. Rule Civ. P. 8(a)(2)). Thus, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009); *see also Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Factual allegations that are "merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement to relief," and thus are inadequate. *Id.* (internal quotations omitted). Accordingly, the requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (internal citations omitted). *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, *i.e.,* the type of claim at issue).

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the Court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. *See Norris v. Hurst Trust,* 500 F.3d 454, 461,

n. 9 (5th Cir.2007); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640, n. 2 (5th Cir. 2005). When a defendant attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, however, the Court can also properly consider those documents. *Causey v. Sewell Cadillac–Chevrolet, Inc*., 394 F.3d 285, 288 (5th Cir.2004); *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir. 2000).

In evaluating motions to dismiss filed under Rule 12(b)(6), the Court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th. Cir.), *cert. denied,* 476 U.S. 1159 (1986). Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir. 2001). On the other hand, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal*, 556 U.S. at 678 ("tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant").

**B. <u>Judge Kern Reese – "Breach of Implied Contract"  Under  Civil Code article 3019</u>**

As its third cause of action, CFP seeks to hold Judge Reese personally liable for "repayment of the funds expended" by CFP in taking "steps . . . to obtain site control" of the Canal Street

property.[7]  In support of this request, CFP alleges that Judge Reese lacked necessary authority to direct CFP to take the steps it did.[8]  According to CFP, its claim against Judge Reese is one of personal liability for breach of an implied contract, based on Louisiana Civil Code article 3019, rather than default or breach of any obligation under the terms of the Agreement.  As with its breach of contract and open account claims against JBC, CFP seeks to recover $953,650.04, as payment for its fee and all third-party expenses incurred through the date of termination, plus interest, from Judge Reese.[9]  Considering CFP's allegations in light of the applicable legal principles, the Court finds, given the circumstances presented here, that CFP's claim against Judge Reese fails.

Specifically, Civil Code article 3019, on which CFP's claim against Judge Reese rests, provides: "a mandatary who exceeds his authority is *personally bound to the third person with whom he contracts*, unless that person knew at the time the contract was made that the mandatary had exceeded his authority or unless the principal ratifies the contract." La. Civ. Code Ann. art. 3019 (1998) (emphasis added).  Civil Code article 3019, however, is properly construed in the context of a preceding, related article, Civil Code article 3016.  That article states: "A mandatary who contracts in the name of the principal within the limits of his authority *does not bind himself personally for the performance of the contract."* La. Civ. Code Ann. art. 3016 (1998) (emphasis added).  In this instance, CFP seeks to hold Judge Reese personally liable for actions that CFP contends it took based on, and pursuant to, the PSA.[10]  Thus, considering Civil Code articles 3016 and 3019 together, the actual scope and extent of the personal obligation allegedly imposed upon

---

[7]      *See* Rec. Doc. 1 at ¶¶ 56-57.
[8]      *See* Rec. Doc. 1 at ¶¶ 26-30.
[9]      *Id.* at ¶¶ 40-55 and 56-57.
[10]     *Id.* at ¶¶ 26-30 and 42-53.

Judge Reese are determined by the contractual terms to which CFP and JBC agreed.[11]   Indeed, as set forth in Civil Code article 1983, "[c]ontracts have the effect of law for the parties"; moreover, "except for immutable matters of public policy, law rules of the Code are suppletive, not mandatory[,]" provisions that apply only "if the contract fails adequately to cover a given issue." *Gen. Elec. Capital Corp. v. Se. Health Care, Inc*., 950 F.2d 944, 951 (5th Cir. 1991).

Significantly, one of the contractual terms agreed to by the parties, as set forth in Article XIII, Section 15 of the Agreement, expressly provides: "no member, official, or employee of either party shall be personally liable to the other party . . . in the event of any default or breach or on any obligations under the terms of the Agreement."[12]   In its complaint, CFP expressly alleges and acknowledges that Judge Reese, in its dealings with CFP, acted as a "member" and "Chairman" of the Board of the Commissioners and Executive Committee of the JBC.[13]   It further alleges that the JBC breached the Agreement by failing to give CFP the 30 days prior notice required by Article X, Section 2 of the Agreement  for a "Termination for Convenience," and is obligated to pay CFP $953,650.04 for the remainder of its development fee and for all third-party expenses accrued as of the date of termination.  Accordingly, CFP seeks to recover the remainder of its fee and the third party expenses, pursuant to the Agreement, plus interest, and, based on the Louisiana open account statute, La. R.S. 9:2781, attorney's fees, from JBC.[14]

---

11      Although the Agreement was signed on December 19, 2014, it was made effective retroactive to February 18, 2014. Notably, CFP does not argue that Judge Reese lacked authority to enter into the PSA on behalf of the JBC. Rather, CFP emphasizes the validity of the PSA. *See, e.g.,* Rec. Doc. 1, ¶¶ 25-26 and 41.  Thus, Judge Reese's alleged lack of authority concerns only CFP's efforts and expenditure of funds relative to "obtaining site control" over the Canal Street property, not the PSA in its entirety.  *Id*.at ¶¶ 17-18, 19, and 26-30.  CFP also alleges, however, that its expenditure of funds to obtain control of the Canal Street site was authorized by the Agreement. *See* Rec. Doc. 1, ¶ 44.
12      *See* Rec. Doc. 7-2 at p. 16.
13      *See*, e.g., Rec. Doc. 1 at ¶¶ 9, 15, and 16.
14      *Id*. at ¶¶ 34, 39, and 42-55.  CFP references a letter regarding termination dated October 19, 2015. *Id*. at ¶34.  CFP also seeks to recover attorney's fees from JBC. *Id*. at ¶54.

Under these circumstances, the Court rejects CFP's efforts to hold Judge Reese personally liable as a "backup" measure for the same sums it seeks to recover under the PSA from his principal, JBC. In short, CFP seeks to hold Judge Reese liable for expenses allegedly owed to CFP per the Agreement without invoking and taking into account the actual terms of the Agreement, particularly Article XIII, Section 15. Had CFP wanted a different rule to apply relative to the parties' representatives, it conceivably could have attempted to negotiate the issue and, at a minimum, required written proof of bylaws and resolutions impacting measures taken relative to immovable property. CFP did not, however, and cannot now simply ignore the provisions of the parties' contract that are unfavorable to its position.[15]

Thus, even when viewed in the light most favorable to the non-moving party, that is, Plaintiff CFP, the facts presented by CFP are insufficient to support a facially plausible claim for relief against Judge Reese. The plain language of the Agreement precludes individual liability of

---

[15] Nor is CFP's claim salvaged by its contention, in its opposition memorandum, that: "The contract that implicated in CFP's Complaint is not the Agreement with the JBC but rather the Purchase Agreement and the amendments thereto that relate to the Canal Street property." *See* Rec. Doc. 15, at pp. 2-3. The same is true of CFP's contention that Judge Reese was the principal relative to those documents. *Id.* The only finalized, effective agreement between CFP and JBC that is adequately pled in the complaint is the Professional Services Agreement ("Agreement" or "PSA"). Article XIII, Section 16 of the Agreement specifically provides: "The JBC and the Company acknowledge that nothing contained in this Agreement nor any act by the JBC or the Company shall be deemed or construed by any of them or by an third person to create any relationship of principal or agent, limited or general partner, or joint venture between or among the JBC, the Company and/or any third party." *See* Rec. Doc. 7-2, p. 16. Additionally, although Article III, Section 3 of the Agreement provides: "During Phase I, *Company and JBC* shall negotiate and enter into a definitive binding agreement for the purchase of the Property, on terms and conditions satisfactory to the JBC in its sole discretion," *see* Rec. Doc. 7-2, p. 6 (emphasis added), the complaint does not allege that such an agreement was ever drafted, negotiated, or executed. In any event, the Court has not been provided with a copy of the necessary written document(s). *See* La. Civ. Code arts. 1839, 2623, and 2993 (form requirements for a transfer of immovable property, bilateral promise to sell, and mandate).

the parties' representatives; therefore, Judge Reese cannot be held personally liable for the outstanding bill that CFP claims is owed by Judge Reese's principal, Defendant JBC.[16]

### C. Judge Christopher Bruno – Tortious Interference With Contract

As its fourth cause of action, CFP seeks to hold Judge Christopher Bruno personally liable for $4.48 million in damages (representing CFP's usual and customary development fee of 4% of total development cost) based on Judge Bruno's alleged tortious interference with CFP's contract with the JBC. Specifically, CFP alleges that Judge Bruno intentionally induced his fellow JBC board members to vote to terminate the Agreement with CFP after having made performance of the contract more burdensome.[17] According to CFP, Judge Bruno allegedly interfered by encouraging the other JBC Board members to resist the efforts of Judge Reese and the Executive Committee to build the facility at the Canal Street location because of his and/or Mayor Mitchell Landrieu's interest in alternative sites for a new courthouse, *i.e.* the state-owned Duncan Plaza site and the former Charity Hospital building.[18]

In *Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P,* 689 F.3d 380, 394–96 (5th Cir. 2012), the Fifth Circuit outlined the genesis and evolution of the intentional interference with contract cause of action under Louisiana law:

> In 1989, the Louisiana Supreme Court first recognized the cause of action for intentional interference with a contract in *9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228, 232–34 (La.1989). However, the cause of action that the state's highest court recognized was extremely limited. The court expressly refused to adopt the broad common law doctrine of interference with a contract, because it is "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." *Id*. at 234 (quoting W. Prosser & P. Keeton, The Law of Torts § 129, p. 979 (5th ed.1984))

---

[16]     Given the Court's ruling regarding Civil Code article 3019, the Court does not find it necessary to address the alternative grounds – judicial immunity and statutory immunity under Louisiana Revised Statutes 9:2792.4 and 9:2798.1 – asserted in support of Judge Reese's motion.

[17]     *See* Rec. Doc. 1 at ¶¶ 66-68.

[18]     *See* Rec. Doc. 1 at ¶¶ 11-12 and 31-38.

(internal quotation marks omitted). The court recognized "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *Id.*

Further regarding the duty on which the tort is based, and referencing the "basic policy of our law that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," as set forth in Louisiana Civil Code article 2315, the Louisiana Supreme Court, in *Spurney*, explained:

> [W]e conclude that, in the light of modern empirical considerations and the objectives of delictual law, an officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct. The officer's action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of his corporate authority and in the reasonable belief that his action was for the benefit of the corporation.

> Thus, an officer is privileged to induce the corporation to violate a contractual relation, or make its performance more burdensome, provided that the officer does not exceed the scope of his authority or knowingly commit acts that are adverse to the interests of his corporation. Where officers knowingly and intentionally act against the best interest of the corporation or outside the scope of their authority, they can be held liable by the party whose contract right has been damaged.
>
> * * *

> Since officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability. [] However, the officer's privilege should not be absolute, it should be limited by the purpose for which it is granted, *i.e.,* to allow him to fully perform his fiduciary duty as authorized by his corporation. When the officer's action is detrimental to the corporation or outside the scope of his authority, the officer should be responsible for his intentional acts of interference with the contract rights of another. []

*Spurney,* 538 So.2d at 232.   As outlined in *Spurney,* the elements of the cause of action  are:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation;
> (2) the corporate officer's knowledge of the contract;
> (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome;
> (4) absence of justification on the part of the officer; and
> (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*See Petrohawk Properties,* 689 F.3d at 394-96 (quoting *Spurney*, 538 So. 2d at 234).

Considering the narrow and conservative approach that the Louisiana Supreme Court and other state and federal courts have taken relative to the tort's parameters and application, under Louisiana law, the Court is not persuaded that a viable intentional interference with contract claim against Judge Bruno has been stated here. As a preliminary matter, the Court notes that Judge Bruno is not an officer or director of a private corporation.  Instead, he is an elected Louisiana state district court judge serving by legislative enactment as a member of the JBC -- a public commission and public corporation created for the purpose of building, funding, and managing a new Orleans Parish courthouse.  The differing roles, functions, and limitations of public officers versus that of private corporate officers can be significant.  As discussed in *City of Alexandria,* 735 F. Supp. 2d at 461:

> [a] corporate officer's duty is linked to his status as a trusted agent of the corporation; a public official's duty is linked to his commitment to perform a public service on behalf of the municipality [public body] and its citizens. Private corporations exist for profit or some charitable purpose; municipal corporations [public bodies] exist to govern and provide services to citizens. Thus, we do not find the nature (and perhaps the scope and extent) of those duties to be necessarily identical.

The Louisiana Supreme Court has noted its intention to "proceed with caution in expanding [the tortious interference] cause of action" beyond the scope recognized in *Spurney*. *See Great Sw. Fire Ins. Co. v. CNA Ins. Cos.,* 557 So.2d 966, 969 (La.1990); s*ee also Cowen v. Steiner*, 97-1234 (La. 9/19/97), 701 So. 2d 140 (reversing without opinion court of appeal's allowance of an intentional interference with contract claim against the medical director of a rehabilitation hospital who allegedly had the same power as, but was not, a "titled" corporate officer). Louisiana appellate courts and federal courts applying Louisiana law have likewise been hesitant to expand the cause of action beyond corporate officers and directors. *See, e.g., Hawkins v. Decuir, Clark, & Adams, LLP*, 2016-1338 (La. App. 1 Cir. 8/16/17), 2017 WL 3528872 (attempt to analogize relationship of "chief legal officer" for the Board of Supervisors for the Southern University and A&M College System to that of a corporate officer not convincing); *City of Alexandria v. Cleco Corp*., 735 F. Supp. 2d 448, 463 (W.D. La. 2010) (Louisiana cause of action for tortious interference with contract not applicable to mayor and city attorney of a municipality); *but see Communication and Info. Resources v. Expressions Acquisition Corp*., 95-1070 (La. App. 5 Cir. 5/15/96), 675 So.2d 1164, 1169 (finding member of corporate board of directors to be "within the ambit of *Spurney*").

Furthermore, as set forth above, an intentional interference with contract claim can be asserted against a corporate officer who violates an obligation owed to a third person having a contractual relationship with the corporation (by intentionally causing the corporation to breach the contract, or to make its performance more burdensome, difficult, impossible, or of less value to the third person) *unless* the officer has reasonable justification for his conduct. Significantly, the corporate officer's action is justified, and he is entitled to a privilege of immunity against the third person's claim, if the officer acted within the scope of his authority and in the reasonable

belief that his action was for the benefit of the corporation he serves. Indeed, "[s]ince officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability." *Spurney,* 538 So.2d at 232. Thus, it is only where officers knowingly and intentionally act against the best interest of the corporation or outside the scope of their authority that they can be held liable by the party whose contract right has been damaged. *Id.*

In this instance, the intentional interference with contract claim asserted against Judge Bruno is premised on his alleged lack of support for and/or objection to proceeding, as proposed by CFP and members of the JBC Board, relative to the acquisition of the Canal Street site for the purpose of building a courthouse. It is further alleged that Judge Bruno served as Mayor Landrieu's liaison vis-à-vis the other Board members and apparently preferred (or at least wanted to further consider) locating the new courthouse in the former Charity Hospital building or, if donated by the state, at Duncan Plaza. It is possible that Judge Bruno's actions and preferences may have been contrary to that of the other JBC Board members, slowed the JBC's efforts to construct a new courthouse, and presently precluded CFP from earning a $4.48 million development fee. It is not apparent from CFP's overly conclusory, and thus deficient, allegations, however, that Judge Bruno's alleged conduct was outside the scope of his authority as a JBC Board member, or without reasonable belief that his actions or inaction were for the benefit of the JBC, the courts served by the JBC, and/or Orleans parish citizens, taxpayers, and litigants.[19]

---

[19]    Relative to this point, CFP contends "Judge Bruno acted intentionally to breach CFP's contract with JBC *because* he was told by the Mayor that the Mayor would be able to get the outgoing governor to *donate* the Duncan Plaza site to the city for use by the JBC." *See* Rec. Doc. 1, ¶ 35. As alleged, it is difficult to understand how exploring whether the City could obtain Duncan Plaza *by donation* from the state of Louisiana is unreasonable. To the contrary, an argument seemingly could be made that the JBC Board members would breach their public duties if this option was not at least investigated.

Rather, it is difficult to fathom how having all of the judges of the Civil District Court as members of the JBC, as provided by the Act, would *not* yield certain legitimate differences in opinions and priorities that would have to be considered and resolved as part of the process of constructing a new courthouse.[20]  Indeed, though not addressed by CFP, certain provisions of the Agreement, as well as the multiple legislative extensions of the deadline established in the Act, appear to contemplate such matters and further weaken the efficacy of CFP's allegations against Judge Bruno.  For instance, Article III, Section 2(A)(3) of the Agreement provides for CFP and JBC, during Phase 1, to "negotiate and enter into a definitive binding agreement for the purchase of the property, *on terms and conditions satisfactory to JBC in its sole discretion.*"[21]  Article X, Section 2, moreover, gives JBC the right to terminate the PSA for "*convenience,*" i.e., "without cause by giving written notice to the Company of its intent to terminate at least thirty (30) days prior to the date of termination[.]"[22]  The PSA, moreover, is non-exclusive such that "JBC [is] free to engage the services of other contractors for the provision of some or all of the Services set forth in [the PSA]."[23]  Finally, as previously set forth, Article XIII, Section 15, expressly states: "No member, official, or employee of either party shall be personally liable to the other party, or any successor in interest, in the event of any default or breach or on any obligations under the terms of the Agreement." [24]

As evidenced herein, the Court has carefully considered the parties' submissions and applicable law.  Even when viewed in the light most favorable to CFP, as the non-moving party, the Court, for the reasons stated, finds CFP's factual allegations to be overly conclusory and legally

---

[20]    The likelihood is increased even more if, as CFP alleges, all of the judges of the First City Court also served as *de facto*, if not *de jure*, members of the JBC.  *See* Rec. Doc. 1 at ¶ 10.
[21]    *See* Rec. Doc. 7-2, p. 6 (emphasis added).
[22]    *See* Rec. Doc. 7-2, p. 14 (emphasis added).
[23]    *See* Rec. Doc. 7-2, p. 15.
[24]    *See* Rec. Doc. 7-2, p. 16.

insufficient to support a facially plausible claim against Judge Bruno for intentional interference with a contract.[25]

III.     **CONCLUSION**

For the reasons stated herein, the Court finds the motions to dismiss filed by Defendant Judge Kern Reese and Defendant Judge Christopher Bruno to be meritorious.  Accordingly, **IT IS ORDERED** that the motions to dismiss (Rec. Docs. 6 and 7) are **GRANTED**.  **IT IS FURTHER ORDERED** that Plaintiff CFP's claims against Defendants Bruno and Reese are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this  7th day of September 2017.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**

---

[25]     Given the Court's foregoing resolution of CFP's Louisiana tort claim for intentional interference with contract, the Court does not find it necessary to address the alternative grounds -- reliance on Article VIII, section 15 of the Agreement; statutory immunity under Louisiana Revised Statutes 9:2792.4 and 9:2798.1; and the freedom of speech protection provided by the First Amendment to the United States Constitution – that Judge Bruno has asserted in support of his motion.